UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOSE JESUS ZAVALA, | Case No. 17-cv-02715-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE** |
| COMMISSIONER OF SOCIAL SECURITY, | Re: ECF No. 20 |
| Defendant. | |

## INTRODUCTION

Plaintiff Jose Jesus Zavala seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II of the Social Security Act.[1] He moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge

---

[1] Compl. – ECF No. 1 at 2; Motion for Summary Judgment – ECF No. 20 at 3. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. – 20.

[3] Cross-Mot. – ECF No. 29.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On December 10, 2012, Mr. Zavala, born on December 27, 1967, and then age 44, filed a claim for social-security disability insurance ("SSDI") benefits under Title II of the Social Security Act ("SSA").[5] He alleged a lower-back injury, with an onset date of November 28, 2012.[6] The Commissioner denied his SSDI claim initially and on reconsideration.[7] Mr. Zavala requested a hearing.[8]

Administrative Law Judge Richard Laverdure (the "ALJ") held two hearings in Oakland, California — one on November 25, 2014 and the other on July 8, 2015.[9] Attorney Eric Patrick represented Mr. Zavala at both hearings.[10] The ALJ heard testimony from Mr. Zavala, vocational experts ("VE") Jo Ann Yoshioka and Jeffrey Malmuth, and medical expert ("ME") Anthony Francis.[11] On July 30, 2015, the ALJ issued an unfavorable decision.[12] Mr. Zavala appealed the decision to the Appeals Council on September 28, 2015.[13] The Appeals Council denied his request for review on March 14, 2017.[14] On May 10, 2017, Mr. Zavala filed this action for judicial

---

[4] Consent Forms – ECF Nos. 7, 8, 12.

[5] AR 318–324. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[6] AR 115, 318.

[7] AR 115–123 (initial determination); AR 124–136 (reconsideration).

[8] AR 162–63.

[9] AR 47–65 (November 2014 hearing transcript); AR 66–114 (July 2015 hearing transcript).

[10] AR 47, 66.

[11] AR 47, 66.

[12] AR 26–41.

[13] AR 24–25.

[14] AR 1–9.

review[15] and moved for summary judgment on June 26, 2018.[16] The Commissioner opposed the motion and filed a cross-motion for summary judgment on October 22, 2018.[17]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 David Chow, M.D. — Treating

David Chow, M.D., a spine-care and pain-management specialist, treated Mr. Zavala on multiple occasions from February 2011 through July 2015.[18] He saw Mr. Zavala primarily for "bilateral low back pain radiating into the right buttock and right posterior thigh."[19] He noted that Mr. Zavala stopped working in late November 2012 due to pain.[20]

From December 2012 through July 2015, Dr. Chow repeated the following findings regarding Mr. Zavala's musculoskeletal and spine examinations: Mr. Zavala's skin was within normal limits in all limbs, except for a well-healed scar from his L5-S1 fusion.[21] His "[l]umbar ranges of motion were restricted by pain in all directions."[22] He had "tenderness upon palpation of the mid lumbar spine overlying the L4 to S1 regions and bilateral lumbar paraspinal muscles overlying the L4 to S1 facet joints."[23] His "thoracolumbar muscle spasm" and "[l]umber discogenic provocative

---

[15] Compl. – ECF No. 1.

[16] Mot. – ECF No. 20.

[17] Cross-Mot. – ECF No. 29.

[18] *See* AR 545–603, 607–738, 800, 973-74. The court does not consider Dr. Chow's opinions from before the alleged onset date of November 28, 2012.

[19] *See* AR 545–603, 607–738, 800, 973-74.

[20] AR 554.

[21] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

[22] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

[23] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

United States District Court
Northern District of California

maneuvers" were both positive.[24] His nerve root tension signs were negative bilaterally, muscle stretch reflexes were symmetric bilaterally in the lower extremities, and Clonus, Babinski's, and Hoffmann's signs were absent bilaterally.[25] Mr. Zavala's muscle strength was "5/5" in his bilateral lower extremities.[26] Dr. Chow diagnosed Mr. Zavala with the following conditions: right S1 radiculopathy;[27] status post-percutaneous spinal-cord-stimulator trial; status post-L5-S1 lumbar fusion with hardware removal; lumbar-disc protrusion; lumbar stenosis; lumbar-degenerative-disc disease; lumbar-facet-joint arthropathy; lumbar sprain/strain; and gastrointestinal upset secondary to industrially-related medications.[28]

In addition to the above findings, beginning April 2013, Mr. Zavala's muscle strength was "4+/5 in the right extensor hallucis longus and gastrocnemius and soleus."[29] His muscle strength remained "5/5" in the bilateral lower extremities.[30]

Dr. Chow noted that "[p]rolonged sitting and standing, lifting, twisting, driving, and any activities" exacerbated Mr. Zavala's conditions.[31] "Lying down on [his] back, sitting, stretching, and medications" mitigated them.[32]

---

[24] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

[25] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

[26] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 721, 725, 728, 731, 734, 737, 973.

[27] Radiculopathy is "a nerve disorder that causes radiating pain." *Hanson v. Colvin*, 760 F.3d 759, 759 (7th Cir. 2014).

[28] AR 546, 552, 555, 608, 611, 614, 617, 620, 623, 626, 629, 642, 645, 648, 651, 654, 657, 660, 663

[29] AR 608, 611, 614, 617, 620, 623, 626, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 725, 728, 731, 734 737, 973.

[30] AR 608, 611, 614, 617, 620, 623, 626, 642, 645, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 713, 717, 725, 728, 731, 734 737, 973.

[31] AR 545, 551, 607, 610, 613, 616, 619, 622, 625, 628, 641, 644, 647, 650, 653, 656, 659, 662, 665, 668, 671, 674, 677, 680, 683, 686, 712, 716, 720, 724, 727, 730, 733, 736, 972.

[32] AR 545, 551, 607, 610, 613, 616, 619, 622, 625, 628, 641, 644, 647, 650, 653, 656, 659, 662, 665, 668, 671, 674, 677, 680, 683, 686, 712, 716, 720, 724, 727, 730, 733, 736, 972.

Throughout the course of his treatment, Dr. Chow prescribed Mr. Zavala several pain medications, including OxyContin, Percocet, Soma, and Baclofen.[33] He noted that OxyContin provided "60% improvement of [Mr. Zavala's] pain with 60% improvement of his activities of daily living such as self-care, dressing."[34] Percocet provided 40 to 50% "improvement of [Mr. Zavala's] pain with 50% improvement of his activities of daily living."[35] Soma provided 50 to 80% improvement "of [his] spasms" and 50 to 80% "improvement of [his] activities of daily living."[36] Baclofen was prescribed "for a short-term acute basis."[37] It provided "40% improvement of his spasm with 40% improvement of his activities of daily living."[38] Baclofen was not prescribed at the same time as Soma but only when Mr. Zavala was unable to get Soma.[39] Mr. Zavala reported that his "Oswestry Disability Index[40] score [was] a 26 (52% disability) with the use of Percocet, while [his] Oswestry Disability Index score [was] 37 (74% disability) without the

---

[33] *See* AR 546 (March 2013 exam); AR 552 (January 11, 2013 exam); AR 608 (October 7, 2013 exam); AR 611 (September 11, 2013 exam); AR 614 (August 14, 2013 exam); AR 620 (June 17, 2013 exam); AR 623 (May 20, 2013 exam); AR 626 (April 23, 2013 exam); AR 629 (March 29, 2013 exam); AR 642 (October 28, 2014 exam); AR 646 (September 30, 2014 exam); AR 648 (September 2, 2014 exam); AR 651 (August 5, 2014 exam); AR 655 (July 8, 2014 exam); AR 672 (March 17, 2014); AR 675 (February 17, 2014); AR 678 (January 22, 2014); AR 682 (December 27, 2013); AR 684 (December 2, 2013); AR 687 (November 4, 2013); AR 714 (June 30, 2015); AR 718 (June 2, 2015); AR 722 (May 5, 2015); AR 726 (April 7, 2015); AR 729 (March 11, 2015); AR 732 (February 11, 2015); AR 735 (January 15, 2015); AR 737 (November 25, 2014); AR 974 (July 28, 2015).

[34] AR 651, 654, 657, 660, 666, 672, 675, 678, 681, 684, 713.

[35] AR 651 (August 5, 2014); AR 654 (July 8, 2014); AR 657 (June 11, 2014); AR 660 (May 14, 2014); AR 666 (April 16, 2014); AR 672 (March 17, 2014); AR 678 (January 22, 2014); AR 681 (December 27, 2013); AR 714 (June 30, 2015).

[36] AR 654, 657, 672, 675, 678, 681, 714.

[37] AR 654, 657, 660.

[38] AR 654, 657, 660, 663.

[39] AR 663.

[40] The Oswestry Disability Index is "a questionnaire which the patient himself fills out regarding his pain intensity, as well as his ability to walk, sit, stand, and lift items, among other things. . . . [It is n]o more than a vehicle for patients to self-report their symptoms[.]" *Hejazi v. Colvin*, No. 13-CV-11129-DPW, 2014 WL 3513398, at *12 (D. Mass. July 11, 2014).

use of Percocet."[41] He reported the same Oswestry Disability Index scores with respect to his OxyContin use.[42]

Dr. Chow advised Mr. Zavala regarding the risks and benefits of long-term opioid use for chronic-pain treatment, including risks relating to sleepiness, respiratory depression, cognitive dysfunction, physical dependency on medication, and possibility of addiction.[43] Mr. Zavala continued opioid therapy despite these risks.[44] Dr. Chow noted that Mr. Zavala was on an "up-to-date pain contract" and his previous drug screens were "consistent with no aberrant behaviors."[45]

In December 2012, March 2013, May 2013, January 2015, and May 2015, Mr. Zavala sought early refills of his pain medications, including OxyContin and Percocet.[46]

On April 23, 2013, Mr. Zavala reported "an aggravation of his right lower extremity S1 radiculopathy pain with increased muscle spasms."[47] Dr. Chow recommended a "right S1 transforaminal epidural steroid injection" to treat Mr. Zavala's increased pain.[48] He later authorized that Mr. Zavala receive the epidural-steroid injection.[49]

---

[41] AR 642, 655, 737.

[42] AR 642, 737.

[43] AR 546 (March 2013 exam); AR 552 (January 11, 2013 exam); AR 608 (October 7, 2013 exam); AR 611 (September 11, 2013 exam); AR 614 (August 14, 2013 exam); AR 620 (June 17, 2013 exam); AR 623 (May 20, 2013 exam); AR 626 (April 23, 2013 exam); AR 629 (March 29, 2013 exam); AR 642 (October 28, 2014 exam); AR 646 (September 30, 2014 exam); AR 648 (September 2, 2014 exam); AR 651 (August 5, 2014 exam); AR 655 (July 8, 2014 exam); AR 672 (March 17, 2014); AR 675 (February 17, 2014); AR 678 (January 22, 2014); AR 682 (December 27, 2013); AR 684 (December 2, 2013); AR 687 (November 4, 2013); AR 714 (June 30, 2015); AR 718 (June 2, 2015); AR 722 (May 5, 2015); AR 726 (April 7, 2015); AR 729 (March 11, 2015); AR 732 (February 11, 2015); AR 735 (January 15, 2015); AR 737 (November 25, 2014); AR 974 (July 28, 2015).

[44] AR 546, 552, 608, 611, 614, 620, 623, 626, 629, 643, 649, 651, 655, 672, 676, 679, 682, 684, 687, 714, 718, 722, 726, 729, 732, 735, 738, 974.

[45] AR 642, 651, 654, 657–58, 663, 666, 675, 678, 681, 714.

[46] AR 554 (December 2012); AR 546 (March 2013) ("due to inadequate pain coverage"); AR 662 (May 2013); AR 730 (January 2015) ("due to increased pain from travel"); AR 720 (sought refills one day early).

[47] AR 625.

[48] AR 626.

[49] AR 623.

In July 2013, Dr. Chow reviewed with Mr. Zavala his May 2013 urine-drug-screen results.[50] They showed "the presence of prescribed medications in addition to hydrocodone and its metabolites."[51] Mr. Zavala reported "50% relief of right lower extremity radiculopathy symptoms since receiving his right S1 selective nerve root block."[52] As a result, Dr. Chow found Mr. Zavala could continue to be treated nonsurgically.[53] He recommended, however, that Mr. Zavala reconsider a permanent spinal-cord-stimulator implant.[54]

In August 2013, Dr. Chow recommended another in-office random "12-panel urine drug screen for 'cause'" because Mr. Zavala's July 2013 drug-test results revealed "presence of Hydrocodone and Oxycodone."[55] Dr. Chow counseled Mr. Zavala regarding the appropriate use of his prescribed medications.[56]

During a November 2013 visit, Dr. Chow noted that Mr. Zavala was working "full-time" as a carpenter.[57] The next month, Dr. Chow took another random "12-panel urine drug screen" because of Mr. Zavala's chronic opioid-pain-medication intake.[58] He also counseled Mr. Zavala regarding the appropriate use of such medications.[59]

In March 2014, Mr. Zavala reported a "depressed mood" and that he "d[id] not like being around other people very much."[60] He reported no plan to harm himself or others.[61] His pain was

---

[50] AR 616.

[51] *Id.*

[52] *Id.*

[53] AR 617.

[54] *Id.*

[55] AR 614.

[56] *Id.*

[57] AR 687.

[58] AR 684.

[59] *Id.*

[60] AR 671.

[61] *Id.*

at "7/10 on visual analog scale."[62] Dr. Chow sought a psychologic consultation to evaluate Mr. Zavala's "depressed mood secondary his industrial pain."[63] He also prescribed Cymbalta to treat Mr. Zavala's low-back and neuropathic pain.[64] He noted that Mr. Zavala had completed his doses of OxyContin, Percocet, and Soma as of March 17, 2014.[65] Dr. Chow ordered another random in-house urine-drug screen because of Mr. Zavala's chronic opioid pain-medication intake.[66] Dr. Chow also noted that Mr. Zavala worked as a carpenter at that time.[67]

In August 2014, Dr. Chow noted that Mr. Zavala's July 2014 urine-drug-screen results were consistent with his medications.[68]

On November 25, 2014, Dr. Chow submitted a medical-source statement.[69] He found that Mr. Zavala could stand/walk no more than two hours in an eight-hour workday and between two to four hours total during the day.[70] Mr. Zavala could sit no more than two hours in an eight-hour workday and between four to five hours total during the day.[71] He had no restrictions in regard to using his hands, fingers, or feet in repetitive motions or being exposed to environmental factors such as heat, cold, dust, dampness, or height.[72] Mr. Zavala could occasionally lift and carry between ten to twenty pounds and could never lift or carry twenty-pounds or more.[73] He could never climb, stoop, or reach below the knees or from waist to knees.[74] He could occasionally

---

[62] *Id.*

[63] AR 669.

[64] *Id.*

[65] AR 671.

[66] AR 673.

[67] AR 666.

[68] AR 650 (August 5, 2014).

[69] AR 689–90.

[70] AR 689.

[71] *Id.*

[72] *Id.*

[73] AR 690.

[74] *Id.*

balance, kneel, crouch, crawl, and reach from waist to chest.[75] He could frequently reach from his chest to above his shoulders.[76] Dr. Chow noted that Mr. Zavala took opioid-analgesic medications, which caused dizziness and somnolence.[77]

In January 2015, Dr. Chow reported that Mr. Zavala's October 2014 drug-screen results showed "presence of Tizanidine and Methocarbamol" in addition to his prescribed medications.[78]

In June 2015, Dr. Chow ordered another random in-office urine-drug screen because of Mr. Zavala's opioid-pain-medication intake.[79] He noted that Mr. Zavala was "a 'moderate' risk due to chronic opioid intake."[80]

### 2.1.2    Calvin Pon, M.D. — Examining

On October 15, 2013, Calvin Pon, M.D. completed a consultative orthopedic-disability evaluation for Mr. Zavala.[81] Mr. Zavala reported a history of low-back injury from 2001.[82] He was injured while working as a carpenter.[83] He had two lumbar-spine surgeries — the first in 2003, and the second in 2004 for hardware removal.[84] It was recommended to Mr. Zavala that he have another lumbar-spine surgery, but he chose not to.[85] Mr. Zavala complained of "associated left lower extremity pain" and numbness.[86] He had those symptoms before his surgeries as well.[87]

---

[75] Id.

[76] Id.

[77] Id.

[78] AR 733.

[79] AR 718.

[80] Id.

[81] AR 604.

[82] Id.

[83] Id.

[84] Id.

[85] Id.

[86] Id.

[87] Id.

After the lumbar-spine surgery, his symptoms "slightly improve[d]."[88] Mr. Zavala never had any electrodiagnostic studies.[89]

Mr. Zavala reported being able to sit and stand for one hour each.[90] He could walk for less than one mile.[91] He could climb stairs.[92] Mr. Zavala lived in a house with one step leading to the front door.[93] He also ambulated without aid.[94] He did not cook or prepare his own meals, but he ate independently.[95] He needed "some assistance" with grocery shopping.[96] He managed his personal hygiene independently.[97] In regard to housework, Mr. Zavala washed dishes, took out the garbage, vacuumed, swept, and mopped the floor.[98] He did not do laundry.[99] He drove and put gasoline in the car.[100]

Dr. Pon noted that, during the evaluation, Mr. Zavala sat "comfortably" in a chair, alert, and in no acute distress.[101] Mr. Zavala could rise from the chair and "stand erect normally."[102] When he stood, Mr. Zavala placed most of his weight on his left lower extremity.[103] His gait was stable.[104] But his gait velocity and stride length were "slightly less than normal."[105] He had a "slight limp"

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] AR 605.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

on his right.[106] He could squat "approximately one-half of the way down" but was "limited by low back pain and right lower extremity pain and numbness."[107] He could move to an upright position and get on and off the exam table normally.[108]

In regard to Mr. Zavala's upper extremities, Dr. Pon noted that he had "relativity full active ROM [range of motion]" in his neck.[109] Mr. Zavala was able to "abduct and forward flex" both shoulders to 150 degrees. He had full active range of motion of his elbows and wrists in flexion and extension.[110] Dr. Pon found the following with respect to Mr. Zavala's manual motor-muscle testing: "[s]houlder bilaterally 5/5, right grip strength 5/5, left grip strength 5/5, bilateral pinch strength normal."[111] Mr. Zavala's fine-finger movements were intact bilaterally, he could pick up a coin normally with both hands, and he was able to write legibly with his right hand.[112]

In regard to Mr. Zavala's lower extremities, Dr. Pon noted that he could "extend both hips to neutral, flex his left hip to approximately 70 degrees limited by low back pain, [and] flex his right hip approximately 30 degrees limited by low back pain."[113] He had full active range of motion of his left knee in extension and flexion, but left knee flexion was approximately 130 degrees "limited by low back pain and right lower extremity pain and numbness."[114] Dr. Pon found the following with respect to Mr. Zavala's manual motor-muscle testing: "[l]eft hip 4-/5 limited by low back pain, right hip 2+ to 3-/5 limited by low back pain, left knee extensors and flexors 5/5, right knee extensors 5/5, right knee flexors 4/5 limited by low back pain, bilateral ankle dorsiflexors and plantar flexors 5/5."[115]

---

[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*

Dr. Pon opined that, with respect to his history of lumbar-spine surgery, Mr. Zavala had lumbar-disc disease, lumbar stenosis, lumbar-degenerative-disc disease, and lumbar-facet-joint arthropathy.[116] With respect to his right lower-extremity pain and numbness, Dr. Pon opined that Mr. Zavala had right S1 radiculopathy.[117] In support of this finding, Dr. Pon noted that Mr. Zavala had a "slight limp on the right during ambulation and symptomatic limitations in his ability to squat."[118]

Dr. Pon further opined that Mr. Zavala had the following functional capacity:

> [He] should be able to stand and/or walk for a total of 6 hours during an 8 hour workday. He should be able to sit for a total of 6 hours during an 8 hour workday. Stooping should be limited to occasionally. He is able to perform limited crouching, kneeling, and squatting occasionally. Climbing stairs should be limited to occasionally. Climbing ladders should be limited from rarely to occasionally. Crawling should be limited to occasionally.
>
> There is no restriction in performing bilateral pushing and pulling arm/hand control. There is no restriction in performing pushing left leg/foot control. In spite of his complaint of right lower extremity pain and numbness, he should still be able to perform pushing right leg/foot control frequently. He should be able to lift and carry frequently 10 lbs. and occasionally 20 lbs. There is no limitation in reaching bilaterally. There is no limitation in his ability to perform gross and fine manipulative tasks with both hands.
>
> Regarding his ability to travel, he does drive. He is also able to take public transportation.[119]

### 2.1.3   Jogendra Singh, M.D. — Non-Examining

Jogendra Singh, M.D., a state-agency medical consultant, considered the following evidence in support of Mr. Zavala's claims: Mr. Zavala reported he could sit and stand for one hour each; he could walk less than one mile (at most ten minutes) without aid; his gait was stable, and his velocity and stride length were slightly less than normal; he had a slight limp on his right side; his thoracolumbar spine with flexion at forty-five degrees was limited by pain; he had left-hip flexion at seventy degrees, right hip at thirty degrees, and left knee at 130 degrees limited by pain; he

---

[116] AR 606.

[117] *Id.*

[118] *Id.*

[119] *Id.*

could squat at fifty percent; he dressed and took care of his personal hygiene independently, prepared his own meals, but needed help shopping; he reportedly could not cook or do housework; he went outside daily and could drive; he could lift approximately eight pounds (a gallon of milk).[120] Dr. Singh opined that the above evidence did not support the degree of impairment alleged by Mr. Zavala and found his statements were thus only partially credible.[121]

### 2.1.4    Eric D. Schmitter, M.D. — Non-Examining

In March 2015, at the ALJ's request, Eric D. Schmitter, M.D., an orthopedic surgeon, submitted a medical-source statement evaluating Mr. Zavala's alleged disability.[122] Dr. Schmitter opined as follows. Mr. Zavala had chronic lumbar spine pain and post-fusion L5-S1.[123] Consequently, he could never lift or carry over twenty pounds, he could occasionally lift and carry between eleven and twenty pounds, and he could frequently lift and carry up to ten pounds.[124] Mr. Zavala could sit, stand, and walk for up to four hours without interruption.[125] He could sit, stand, and walk for up to six hours total in an eight-hour workday.[126] He did not need a cane to ambulate.[127]

Mr. Zavala had no upper-extremity pathology.[128] Accordingly, he could "continuously" perform reaching, handling, fingering, feeling, pushing, and pulling with both hands.[129] He also had no neurologic deficit and could operate both feet "continuously."[130]

---

[120] AR 129.

[121] AR 130.

[122] AR 691–700.

[123] AR 692.

[124] Id.

[125] AR 693.

[126] Id.

[127] Id.

[128] AR 694.

[129] Id.

[130] Id.

In regard to postural activities, Mr. Zavala could do the following: occasionally climb ladders/scaffolds, stoop, kneel, crouch, and crawl; frequently balance; and continuously climb stairs and ramps.[131] Mr. Zavala could frequently tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations.[132] He could continuously tolerate exposure to operating a motor vehicle.[133]

Mr. Zavala was physically capable to shop, travel alone without assistance, ambulate without aid, use public transportation, climb "a few steps at a reasonable pace with the use of a single hand rail," prepare simple meals, feed himself, care for his personal hygiene, and manage paper/files.[134]

In sum, Dr. Schmitter found that Mr. Zavala's "subjective complaints appear to exceed [the] physical finding[s]."[135] He also found that Mr. Zavala was addicted to proscribed narcotics.[136] Dr. Schmitter opined that Mr. Zavala had the residual functional capacity ("RFC") to perform light activity only.[137]

### 2.2 Mr. Zavala's Testimony

Mr. Zavala previously worked as a lead carpenter.[138] He last worked on November 28, 2012.[139] He stopped working because his "pain got so bad that [he] could barely move."[140] As of July 2015, he had not gone back to work or looked for any other work, including less strenuous work.[141] He

---

[131] AR 695.

[132] AR 696.

[133] *Id.*

[134] AR 697.

[135] *Id.*

[136] *Id.*

[137] AR 700.

[138] AR 53.

[139] AR 53–54.

[140] AR 53.

[141] AR 53–54, 71.

received formal training as a carpenter, including attending seventeen classes over the course of four years.[142]

Mr. Zavala stated that his low back pain would go up "higher, and . . . down to [his] legs."[143] It was worse in his right leg than in his left.[144] The pain went down to his toes on his right leg and to his calf on his left leg.[145] The pain was "burning [,] sharp[,] stabbing[,] numb[, and] tingly."[146] He experienced numbness approximately three or four times per week.[147] He felt the pain both sitting down and standing up — "not [in] a specific position."[148]

In 2003, Mr. Zavala had surgery on his back and then went back to work, up until the alleged onset date of November 2012.[149] His pain was "pretty much the same" during the course of his career, but he also experienced an "increase" in pain "down to [his] legs."[150]

In January 2012, Mr. Zavala underwent a four-day trial for a spine stimulator.[151] Rather than decreasing his pain, he experienced "real sharp, strong pains. Sharp, punching pain . . . like electric shock" with "[e]very move" he made.[152]

Because of his pain, Mr. Zavala "continually" changed positions throughout the day.[153] He moved between positions of sitting, laying down, standing up, and walking "a little bit."[154] He estimated that he spent eight to ten of his waking hours laying down each day.[155] He also took

---

[142] AR 54.

[143] Id.

[144] Id.

[145] AR 54–55.

[146] AR 55.

[147] Id.

[148] Id.

[149] AR 58.

[150] AR 58–59.

[151] AR 55.

[152] AR 56.

[153] Id.

[154] Id.

[155] Id.

naps about three or four times per week for one to two hours at a time.[156] Mr. Zavala took

medication for his pain, including Percocet, Soma, OxyContin, Lyrica, and Methocarbamol.[157] His

medications made him feel "drowsy all the time" and nauseous and made concentrating

difficult.[158] Mr. Zavala could not help with household chores because of his pain.[159] Whenever he

did, his pain got "really bad."[160]

    In July 2013, Mr. Zavala completed a function report in support his disability claims.[161] He

described his daily routine as follows: he gets up to make coffee; lies down and watches

television; visits his mother; drives short distances; goes back and lies down; his wife cooks for

him; he watches television; and then goes to bed.[162] His wife took care of cooking, caring for their

kids, putting on his shoes and socks, and sometimes helped him bathe when he was in "bad

pain."[163] He woke up "a lot with pain."[164] He did not do household chores (including cleaning,

laundry, repairs, ironing, or mowing) because he was in "too much pain."[165] He could visit his

mom "nearby," pick up his kids, and go to doctors' appointments on his own.[166] He went grocery

shopping with his wife. She carried "heavier stuff," and he helped with "small stuff."[167] He was

able to pay bills, count change, handle a savings account, and use a checkbook or money orders.[168]

His pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs,

---

[156] AR 57.

[157] *Id.*

[158] *Id.* As of July 2015, Mr. Zavala had been taking both OxyContin and Percocet for approximately three years. AR 95.

[159] AR 58.

[160] *Id.*

[161] AR 468–75.

[162] AR 469.

[163] *Id.*

[164] *Id.*

[165] AR 469–70.

[166] AR 471–72.

[167] AR 471.

[168] *Id.*

complete tasks, get along with others, and remember certain information.[169] It also affected his

mood, causing him to feel "more depressed" and "stressed out."[170] He could walk ten minutes

before he needed to stop and rest.[171] He could not handle stress well because he was "depressed,

angry," and slept "a lot."[172] He took Percocet, Dexilant, Oxycodone, Lyrica, Methocarbamol, and

Soma.[173] His medications made him "sleepy, constipated, depressed" and caused "mood

swings."[174]

### 2.3 Vocational Expert Testimony

Vocational Expert ("VE") Jo Ann Yoshioka testified at the November 2014 hearing,[175] and VE

Jeffrey Malmuth testified at the July 2015 hearing.[176]

#### 2.3.1 VE Jo Ann Yoshioka's testimony

VE Yoshioka classified Mr. Zavala's past work as a carpenter as medium strength and

performed at "the very heavy level."[177] The ALJ asked whether there were unskilled jobs at the

light and sedentary levels in the economy for the following hypothetical individual: "someone of

claimant's age, education and work experience. . . . No ladders, ropes or scaffolds. Ramps and

stairs and stooping, crouching, crawling, kneeling and balancing are occasional. And no use of

foot pedals or controls."[178] VE Yoshioka testified that such an individual could perform the

following jobs: assembler of small products (706.684-022, SVP two, light); weight tester

---

[169] AR 473.

[170] Id.

[171] Id.

[172] Id.

[173] AR 475.

[174] Id.

[175] AR 59–64.

[176] AR 95–112.

[177] AR 59.

[178] AR 59–60.

(539.485-010, SVP two, sedentary); box inspector of wooden crates (762.687-014, SVP two, light); and electrical-equipment patcher (723.687-010, SVP two, sedentary).[179]

VE Yoshioka then considered a second hypothetical: the individual in the first hypothetical needed an "hourly change of position for up to ten minutes" (for example, if the job primarily involved standing, the individual would need to sit for minutes, and vice versa).[180] VE Yoshioka testified that such a hypothetical individual could work as either a weight tester or electrical-equipment patcher (the two sedentary jobs) because both jobs had a sit-or-stand option.[181]

VE Yoshioka considered a third hypothetical: the above hypothetical individual could not be exposed to hazardous machinery (*i.e.*, machinery that could threaten life or limb).[182] She testified that such a limitation would not prevent those individuals from performing the above jobs.[183]

She also testified that if a fourth hypothetical individual could only occasionally reach bilaterally (waist to chest) and could never reach below the knees, bend, or stoop, that individual would be precluded from all jobs (including those listed above).[184]

In considering a fifth hypothetical individual who could never stoop but who otherwise had no bilateral reaching limitations, VE Yoshioka testified that such an individual could work as a box inspector, but that all other jobs listed above required some stooping.[185]

VE Yoshioka further testified that if an individual needed to be off task approximately twenty percent of the day due to medication side-effects, that individual would be precluded from the above jobs.[186] An individual who needed to take unscheduled work breaks "above and beyond the

_United States District Court_
_Northern District of California_

---

[179] AR 60.

[180] AR 60–61.

[181] AR 61.

[182] AR 62.

[183] *Id.*

[184] AR 63.

[185] *Id.*

[186] *Id.*

normal breaks to rest" would also be precluded from such jobs.[187] Similarly, if the individual needed not only to change positions "up to ten minutes every hour" by sitting and standing intermittently but also occasionally needed to walk "away from the work station" to relieve pain, that individual would be precluded from the above jobs.[188]

### 2.3.2   VE Jeffrey Malmuth's testimony

The ALJ posed the following hypothetical: an individual with a sedentary RFC who could never climb ladders, ropes, or scaffolds; could frequently use bilateral lower-extremities; needed to avoid extremes of cold and industrial vibration, unprotected heights, hazardous machinery, and dangerous industrial moving parts; and needed standing or stretching breaks for ten minutes every hour (*e.g.*, if the job provided a raised work bench and a stool).[189] VE Malmuth testified that such an individual might be able to do "telephone work," where he wore a headset and could perform work "standing as well as sitting."[190] Furthermore, such an individual could perform work as a nut sorter (521.687-086, sedentary, SVP two), if performed at a raised bench.[191] He estimated that, for light and sedentary jobs, there would be twenty-five percent fewer jobs for an individual who required a sit/stand option.[192]

VE Malmuth testified that if the above hypothetical individual also could not reach below the waist and could only occasionally reach between the west and chest bilaterally, that individual would not be able to perform the jobs listed above.[193] Moreover, if the individual had to take unscheduled work breaks between one to two hours per day to lie down, due to pain medication side-effects, the individual would be precluded from all work.[194]

---

[187] AR 63–64.

[188] AR 64.

[189] AR 104.

[190] AR 105.

[191] AR 106.

[192] AR 107–08.

[193] AR 111.

[194] AR 112.

### 2.4 Medical Expert Testimony

Anthony Francis, M.D. testified at the July 2015 hearing.[195] Dr. Francis testified that, based on his review of the record, Mr. Zavala had right S1 radiculopathy, status post-lumbar-fusion surgery and post-spinal-cord stimulator.[196] He noted that Mr. Zavala underwent lumbar-fusion surgery in 2003 and then later had the previously implanted metal surgically removed — a "sign that . . . things are . . . hurting pretty badly."[197] He also noted that Mr. Zavala underwent a trial spinal-cord stimulator, but it was unsuccessful.[198] Dr. Francis stated that Mr. Zavala had continued radiculopathy, which may return following surgery or sometimes such patients are "no better than they were before the surgery."[199] He indicated that when a patient gets to the point where he needs a spinal-cord stimulator, "that's almost always a . . . salvage procedure on a pretty bad situation."[200] A patient typically does not undergo such a procedure "unless they're fairly debilitated from just chronic pain."[201]

Dr. Francis opined that Mr. Zavala's case appeared to be a "failed spinal surgery case" that "[p]robably ought to equal a 1.04(a)."[202] He stated that the record contained the following objective evidence indicating a 1.04(a) radiculopathy listing: lumbar spasms; lumbar range of motion restricted by pain in all directions; complaints of pain in dermatomal pattern; numbness in various positions; a slightly antalgic gait; tenderness upon palpation of the mid-lumbar spine overlying the L4 to S1 regions; bilateral lumbar-perispinal muscles overlying the L4 to S1 facet joints; positive thoracolumbar-muscle spasm upon physical examination; and lumbar-discogenic

---

[195] AR 73–95.

[196] AR 74, 83, 89.

[197] AR 75.

[198] AR 74–75.

[199] AR 75.

[200] AR 75, 87.

[201] AR 87.

[202] AR 75, 87–88.

provocative maneuvers.[203] In a failed spinal-surgery case, the "main thing that . . . patients are going to have is pain," specifically pain "at a dermatomal pattern."[204] Dr. Francis stated that "it's a rare case where [a patient] ha[s] everything that's in 1.04(a) present in the chart."[205] Furthermore, radiculopathy symptoms "tend to wax and wane, come and go."[206] In other words, a patient with radiculopathy "may have a fairly good exam and then the next time around they're fairly restricted."[207] Such a patient "may be able to go out and do something fairly rigorously for a day or two, but then whether [that patient] can do that in competitive employment, day after day, is kind of another question."[208]

Dr. Francis did not ultimately conclude whether Mr. Zavala had a sedentary or light RFC because he believed that was "up to the trier of fact."[209] He opined, however, that if Mr. Zavala had a light (rather than sedentary) RFC, Mr. Zavala would be limited in the following ways: lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and walking for six out of eight hours; sitting for six out of eight hours; climbing ramps frequently but never climbing stairs; never using ropes, ladders, or scaffolds; occasionally stooping, bending, crawling, kneeling, squatting, balancing; no upper-extremity limitations; frequent lower-extremity limitations; no unprotected heights; and should avoid excessive industrial vibration, excessive cold, and exposure to hazardous or dangerous machinery with moving parts.[210] Dr. Francis further stated that it was possible that an individual with Mr. Zavala's conditions and who took the same medication

---

[203] AR 83–85, 91.

[204] AR 86.

[205] AR 85.

[206] *Id.*

[207] AR 88.

[208] AR 92.

[209] AR 88–93.

[210] AR 89.

(Percocet, Soma, and OxyContin) would experience pain throughout the day and that such pain might cause the individual to be off task or take unscheduled breaks throughout the day.[211]

### 2.5    Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Zavala was disabled and concluded that he was not.[212]

At step one, the ALJ found that Mr. Zavala had not engaged in substantial gainful activity since November 28, 2012, the alleged onset date.[213]

At step two, the ALJ found that Mr. Zavala had two severe impairments — degenerative-disc disease, and status post-fusion and hardware removal.[214]

At step three, the ALJ found that Mr. Zavala did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (namely, Section 1.04 for degenerative-disc disease).[215] He found that Mr. Zavala had a history of lumbar fusion at L5-S1 in 2003, with hardware removal in 2004.[216] The medical records lacked objective findings, however, showing radiculopathy, neuroanatomic distribution of pain, limitation of motion of the spine, motor loss, and sensory or reflex loss "as contemplated by Section 1.04A."[217] Furthermore, there was no evidence of spinal arachnoiditis or lumbar spinal stenosis "as contemplated by Section 1.04B and 1.04C."[218] Although the record indicated Mr. Zavala had "limited range of motion of the lumbar spine and muscle spasms," he had only "occasional positive straight leg raising tests" and demonstrated "mostly 5/5 motor strength and normal

---

[211] AR 94.

[212] AR 33–41.

[213] AR 34.

[214] *Id.*

[215] AR 35.

[216] *Id.*

[217] *Id.*

[218] *Id.*

sensation throughout."[219] Moreover, although Dr. Chow diagnosed Mr. Zavala with right S1 radiculopathy, the ALJ found "no nerve conduction studies and no objective findings of motor or sensory or reflex loss in the record."[220] He also found no sufficient objective findings or medical evidence to support a conclusion that Mr. Zavala was limited to a six-hour workday.[221]

With respect to Dr. Francis's testimony that this "looked like a failed back surgery case," the ALJ credited only Dr. Francis's opinion that Mr. Zavala had an RFC to perform light work.[222] The ALJ discredited Dr. Francis's opinion that Mr. Zavala's impairments "potentially" equaled a Section 1.04 listing because "[a] 'potential' does not satisfy the claimant's burden of proving 'more likely than not'" at step three of the analysis.[223]

Before considering the fourth step, the ALJ determined that Mr. Zavala had the residual functional capacity to perform light work, with the following limitations: lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for six hours in an eight-hour workday; sitting for six hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds and occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; frequently using foot controls with bilateral lower extremities; never working at unprotected heights or around hazards such as dangerous machinery or moving mechanical parts; avoiding concentrated exposure to extreme cold and industrial vibration; and changing of position from standing to sitting (and vice versa) hourly for ten minutes at his workstation.[224]

In making this determination, the ALJ discounted Mr. Zavala's testimony finding it was only partially corroborated by the medical record.[225] He found that although the record indicated

---

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] AR 36.

ongoing pain-management treatment from Dr. Chow, there were few objective findings since the alleged onset date of November 28, 2012.[226]

For example, while Mr. Zavala

> exhibited a limited range of motion of the lumbar spine and muscle spasms, and had positive straight leg raising tests occasionally, . . . he [] also demonstrated *mostly 5/5 strength throughout the upper and lower extremities, no atrophy, and no decreased range of motion in the lower extremities*[.] There are no imaging studies or nerve conduction studies in the record.[227]

During an October 2013 orthopedic consultative examination, Dr. Pon found that Mr. Zavala had a limited range of motion in the lumbar spine and was limited by low-back pain and right lower-extremity pain and numbness.[228] He opined, however, that Mr. Zavala could stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, occasionally stoop, crouch, kneel, squat and crawl, occasionally climb stairs, and frequently push or use foot controls with the right foot.[229] Based on these findings, the ALJ concluded that while the objective medical evidence showed the Mr. Zavala had a "severe" lumbar impairment, they did not demonstrate "an inability to perform a range of light work (or complete disability, as alleged by the claimant).[230]

The ALJ noted that Mr. Zavala sought narcotic medications refills early.[231] This "at least raises the question of opiate addiction or drug-seeking behavior, notwithstanding that Dr. Chow apparently thinks all is well."[232] The ALJ also found that certain reported activities undermined Mr. Zavala's allegations of disability as well as his testimony that he spend ten hours per day laying down.[233] For example, Mr. Zavala testified that he stopped working in November 2012 (his

---

[226] AR 37.

[227] *Id.* (emphasis in original).

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] *Id.*

[232] AR 38.

[233] *Id.*

alleged onset date.[234] But the record indicated that he worked as a carpenter in November 2013 and March 2014.[235] Moreover, he reported increased pain due to increased travel in February and May 2015.[236]

To the extent their opinions were consistent with his opinion, the ALJ gave "great weight" to the opinions of Drs. Pon and Singh.[237] He accorded "great weight" to Dr. Francis's RFC opinion, but only to the extent that he opined that Mr. Zavala could perform light work.[238] The ALJ found Dr. Francis's conclusion that Mr. Zavala's impairments equaled Listing 1.04A "entirely speculative."[239] The ALJ found that Dr. Schmitter did not "adequately and persuasively explain the basis for his opinion" that Mr. Zavala could perform "a range of light work (with postural limitations)."[240] The ALJ did not rely on that opinion.[241]

Finally, the ALJ considered Dr. Chow's RFC: Mr. Zavala could stand and walk for at most two hours at one time and between two to four hours total during an eight-hour day; he could sit for at most two hours at a time and between four to six hours in an eight-hour workday; he occasionally could carry up to twenty pounds; he could never climb, stoop, or reach below the knees or from his waist to knees; he could occasionally balance, kneel, crouch, crawl, and reach from the chest to the shoulders and above the shoulders.[242] The ALJ found that Dr. Chow "did not reveal any basis" for his opinion, and "no other medical opinion is consistent" with it.[243] Accordingly, the ALJ gave "little weight" to Dr. Chow's RFC assessment.[244]

---

[234] Id.

[235] AR 38.

[236] Id.

[237] Id.

[238] Id.

[239] Id.

[240] Id.

[241] Id.

[242] Id.

[243] AR 38–39.

[244] AR 39.

At step four, the ALJ concluded that Mr. Zavala was unable to perform his past work as a carpenter (which was medium work).[245]

At step five, the ALJ determined that, given Mr. Zavala's age, education, work experience, and RFC, and based on the VE Malmuth's testimony, Mr. Zavala could successfully adjust "to other work that exists in significant numbers in the national economy."[246]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[245] *Id.*

[246] AR 40.

be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

**ANALYSIS**

Mr. Zavala contends that the ALJ erred by failing to (1) provide specific and legitimate reasons for rejecting the opinion of his treating physician, and (2) properly consider Mr. Zavala's testimony.[247] The court considers each argument in turn.

**1. Whether the ALJ Properly Weighed Medical-Opinion Evidence**

Mr. Zavala argues that the ALJ erred in failing to properly weigh the opinion of Dr. Chow, Mr. Zavala's treating physician. The court agrees. The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."[248] *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-

---

[247] Mot. – ECF No. 20 at 5–17.

[248] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, November 16, 2016.

examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the

consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

The ALJ gave little weight to treating physician Dr. Chow's RFC assessment.[249] He found:

> Dr. Chow did not explain why the claimant can only sit for 2 to 4 hours or stand/walk for only 4 to 6 hours, as opposed to sitting, standing, and walking during a full 8-hour day. Further, he did not explain why reaching (rather than lifting/carrying) from the waist to chest is limited to occasionally. The medical evidence, including his own treatment records, does not reveal any basis for that opinion. Further, no other medical opinion is consistent with Dr. Chow's opinion. Notably, Dr. Chow's treatment notes repeatedly indicate that the claimant's "work status" and "work restrictions" were "as per permanent and stationary report" []. Although I requested this report, it has not been produced. [] Thus, I find insufficient objective medical evidence to support the degree of limitation opined by Dr. Chow, and accord his opinion little weight.[250]

The ALJ's first reason for discounting Dr. Chow's opinion — that he "did not explain why" Mr. Zavala had certain restrictions around sitting, standing, walking, and reaching — is not a specific and legitimate reason. Treating sources cannot be rejected solely because they "are not well-supported by medically acceptable clinical and laboratory . . . techniques." SSR 96-2p.[251] *See also Bennett v. Colvin*, 202 F. Supp. 3d 1119, 1133 (N.D. Cal. 2016) (holding that a "fail[ure] to reveal the type of significant and laboratory abnormalities one would expect if the claimant were in fact disabled" did not constitute a specific and legitimate reason for rejecting a physician's opinion because the ALJ failed to "specify which clinical and laboratory abnormalities one should expect" or "any other support for this conclusion").

The ALJ's second reason for discounting Dr. Chow's opinion — that "no other medical opinion is consistent with Dr. Chow's opinion" — is boilerplate and inaccurate. Here, for instance, ME Dr. Francis provided an opinion consistent with Dr. Chow's. Specifically, ME Francis opined that the standing, sitting, and walking limitations evaluated by Dr. Chow could be reasonable.[252]

---

[249] AR 38–39.

[250] AR 38–39.

[251] SSR 96-2p has since been rescinded (as of March 27, 2017) but was in effect at the time of Mr. Zavala's ALJ hearings.

[252] AR 92–94.

He also testified that, based on his review of the record, Mr. Zavala had right S1 radiculopathy, status post lumbar-fusion surgery and post spinal-cord stimulator.[253] He stated Mr. Zavala's lumbar surgeries were a "sign that . . . things are . . . hurting pretty badly."[254] Moreover, he testified that a patient typically does not undergo a "salvage" spinal-cord-stimulator procedure "unless they're fairly debilitated from just chronic pain."[255]

ME Francis found that the following evidence indicated Mr. Zavala had debilitating radiculopathy: lumbar spasms; lumbar range of motion restricted by pain in all direction; complaints of pain in dermatomal pattern; numbness in various positions; a slightly antalgic gait; tenderness upon palpation of the mid-lumbar spine overlying the L4 to S1 regions; bilateral lumbar perispinal muscles overlying the L4 to S1 facet joints; positive thoracolumbar muscle spasm upon physical examination; and lumbar discogenic provocative maneuvers.[256] With respect to a failed spinal surgery case, the "main thing that . . . patients are going to have is pain," specifically pain "at a dermatomal pattern."[257] In sum, ME Francis testified that Mr. Zavala *might* have a light RFC.[258] But he also testified that Mr. Zavala's case appeared to be a "failed spinal surgery case" that "[p]robably ought to equal a 1.04(a) [listing]."[259] *Cf. Carter v. Astrue*, No. C 08-5095 VRW, 2009 WL 2084446, at *2–4 (N.D. Cal. July 14, 2009) (where ME Francis testified that nothing in the medical record "indicated motor weakness, loss of reflexes or a demonstrable dermatome change supporting radiculopathy" and that the plaintiff's case was "'not the most severe chronic pain case that we've seen' because ibuprofen, not narcotic pain medication, was used").

---

[253] AR 74, 83, 89.

[254] AR 75.

[255] AR 87.

[256] AR 83–85, 91.

[257] AR 86.

[258] AR 88–91.

[259] AR 75, 87–88.

ORDER – No. 17-cv-02715-LB

Here, the ALJ discredited Dr. Francis's testimony only to the extent that it was consistent with Dr. Chow's opinion.[260] But the ALJ's reasoning for doing so was contradictory. The ALJ discredited Dr. Francis's opinion that the severity of Mr. Zavala's impairments equaled a 1.04(a) listing because he found it was "entirely speculative."[261] But, by the same logic, Dr. Francis's opinion that Mr. Zavala *might* have a light RFC was also entirely speculative.[262] The ALJ erred in discrediting Dr. Francis's opinion to the extent that it was consistent with Dr. Chow's assessment.

Furthermore, the ALJ found that the opinions of one-time examining physician Dr. Pon and non-examining state-agency medical consultant Dr. Singh were inconsistent with Dr. Chow's opinion and accordingly afforded those opinions "great weight."[263] As the Ninth Circuit noted in *Orn*, however, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" 495 F.3d at 632. Here, Dr. Pon's opinion confirmed the diagnoses of radiculopathy, lumbar-disc disease, lumbar stenosis, lumbar-degenerative-disc disease, and lumbar-facet-joint arthropathy.[264] His opinion differed from treating-physician Dr. Chow's only as to the severity and impact of those impairments. As such, under *Orn*, to the extent that the conclusions of Dr. Pon, as opposed to his "clinical findings," differ from Dr. Chow's conclusions, they are not substantial evidence. *See id.* Similarly, with respect to non-examining medical consultant Dr. Singh, "[t]he opinion of a nonexamining medical advisor cannot by itself constitute

---

[260] AR 38.

[261] *Id.*

[262] AR 88–89 (ALJ: "So, if I pressed you a little harder and said do you have an opinion about an RFC, are you able to formulate one out of this, if I decide it's not a listing level case?" ME Francis: "If it's not a listing level, then the question is going to be – I mean what we have here is kind of an ongoing radiculopathy that is probably intermittent. Sort of waxes and wanes. Probably better on some days than others. . . . So, the question is going to be would he be either at a light or a sedentary. So, what I'll do is I'm going to give you a light RFC. That would be the maximum RFC that he would be reasonably expected to function at, based on the accommodation of having an S1 radiculopathy present, status post surgery."); *id.* at 91 (ALJ: "So, which way are you going?" ME Francis: "Well, I went all over the map. I said it could equal a 1.04(a). Then I gave a light RFC. So, I think it's up to the trier of fact whichever way the trier of fact deems it should go.").

[263] AR 38.

[264] AR 606.

substantial evidence that justifies the rejection of an examining or treating physician." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). Although the ALJ gave Dr. Singh's opinion "great weight," it does not constitute substantial evidence to support the limited weight given to Dr. Chow's opinion. The ALJ accordingly erred in discounting Dr. Chow's opinion.

The ALJ's third reason for discounting Dr. Chow's opinion — that "insufficient medical evidence" supported the "degree of limitation" in Dr. Chow's assessment — is itself insufficient. The ALJ did not consider the factors discussed in *Orn*. As stated above, where an ALJ does not give a treating physician's opinion "'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record" — both of which are grounds that the ALJ gives here — then the Social Security regulations "consider[] specified factors in determining the weight [that opinion] will be given." *Orn*, 495 F.3d at 631. "Those factors include the [l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(b)(2)(i)–(ii)) (alteration in original). Here, Dr. Chow treated Mr. Zavala on a nearly monthly basis — more than forty times total — beginning February 2011 through at least July 2015.[265] He evaluated whether Mr. Zavala's conditions could continue to be treated non-surgically, including by authorizing an epidural-steroid injection.[266] He also closely monitored Mr. Zavala's opioid-drug intake to ensure it was compatible with Mr. Zavala's level of pain.[267] The ALJ discussed none of facts. Their absence from the analysis here further undermines the ALJ's reasoning on this crucial point.

---

[265] *See* AR 545–603, 607–738, 800, 973-74.

[266] AR 623.

[267] *See* AR 546 (March 2013 exam); AR 552 (January 11, 2013 exam); AR 608 (October 7, 2013 exam); AR 611 (September 11, 2013 exam); AR 614 (August 14, 2013 exam); AR 620 (June 17, 2013 exam); AR 623 (May 20, 2013 exam); AR 626 (April 23, 2013 exam); AR 629 (March 29, 2013 exam); AR 642 (October 28, 2014 exam); AR 646 (September 30, 2014 exam); AR 648 (September 2, 2014 exam); AR 651 (August 5, 2014 exam); AR 655 (July 8, 2014 exam); AR 672 (March 17, 2014); AR 675 (February 17, 2014); AR 678 (January 22, 2014); AR 682 (December 27, 2013); AR 684 (December 2, 2013); AR 687 (November 4, 2013); AR 714 (June 30, 2015); AR 718 (June 2, 2015);

### 2. Whether the ALJ Failed to Properly Consider Mr. Zavala's Testimony

Mr. Zavala contends that the ALJ erred in discrediting his testimony.[268] In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester*, 81 F.3d at 834); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found the following regarding Mr. Zavala's testimony:

> The treatment records show that the claimant has regularly sought narcotic pain medication refills early [], which at least raises the question of opiate addiction or drug-seeking behavior, notwithstanding that Dr. Chow apparently thinks all is well.

> [A]lthough the claimant testified that he stopped working November 2012, the treatment records report him working full-time as a carpenter in November 2013 and March 2014 []. Further the claimant reported increased pain due to travel in February and May [] 2015[]. These reported activities undermine his allegations of disability

---

[267] AR 722 (May 5, 2015); AR 726 (April 7, 2015); AR 729 (March 11, 2015); AR 732 (February 11, 2015); AR 735 (January 15, 2015); AR 737 (November 25, 2014); AR 974 (July 28, 2015).

[268] Mot. – ECF No. 20 at 13–17.

as well has [sic] his testimony that he spends 10 hours per day laying down (between 6 am and 11 pm).

Thus, after careful consideration of the entire record, I find that the claimant is capable of performing work within the residual functional capacity established herein.[269]

The ALJ gave two reasons for discounting Mr. Zavala's testimony — his (1) purported "drug-seeking behavior," and (2) activities of daily living.[270] The court considers each in turn.

First, "[w]hen a claimant has a nonmedical motive to exaggerate symptoms in order to obtain drugs, an ALJ may permissibly discredit the claimant." *Jaureque v. Colvin*, No. 11-06358, 2013 WL 1149587, at *5 (N.D. Cal. Mar. 19, 2013) (citing *Edland v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that the likelihood claimant exaggerated his pain complaints to his physician to obtain painkillers was a clear and convincing reason to discredit claimant)). "Thus, a court must defer to an ALJ's reasonable interpretation that a claimant has engaged in drug-seeking behavior and is therefore not entirely credible." *Potter v. Colvin*, No.:3-14-cv-02562-JSC, 2015 WL 1966715, at *21 (N.D. Cal. Apr. 29, 2015) (citing *Massey v. Comm'r Sec. Sec. Admin.*, 400 F. App'x 192, 194 (9th Cir. 2010). Although such behavior may constitute a clear and convincing reason to discredit a claimant, *see Jaureque*, 2013 WL 1149587, at *5, when discounting pain testimony, an ALJ must "point to specific facts which demonstrate that [the claimant] is in less pain than [he] claims," *Potter*, 2015 WL 1966715, at *21; *Vasquez*, 572 F.3d at 591–92. For example, in *Edland*, the ALJ concluded the claimant was likely not credible because he was deceiving a specific doctor about his need for pain medication due to a "Valium addiction." 253 F.3d at 1157–58. Similarly, in *Alexander v. Commissioner of Social Security*, the record indicated the claimant was barred from seeking narcotics from certain doctors, and multiple doctors questioned her underlying diagnoses and suggested her pain complaints were hyperbolic. 373 F. App'x 741, 743–44 (9th Cir. 2010).

_____

[269] AR 37–38.

[270] AR 37–38.

Here, in contrast, the ALJ stated that "the treatment records show that the claimant has regularly sought narcotic pain medication refills early . . . which at least raises the question of opiate addition or drug-seeking behavior."[271] While Dr. Chow did note that Mr. Zavala sought refills early on occasion, in at least one instance, Mr. Zavala sought a refill only one day early.[272] On two other occasions, Mr. Zavala sought early refills "due to inadequate pain coverage"[273] and "increased pain from travel."[274] Furthermore, Dr. Chow consistently reported that Mr. Zavala was on an "up-to-date pain contract" and his drug screens were "consistent with no aberrant behaviors."[275] The ALJ did not sufficiently analyze how the record demonstrates that Mr. Zavala "is in any less pain than [he] claims to be." *Potter*, 2015 WL 1966715, at *22. Moreover, the record contains significant evidence that Mr. Zavala sought drugs to treat his underlying pain. *Id.*; *cf. Carter*, 2009 WL 2084446, at *2–4 (where ME Francis testified that that the plaintiff's case was "'not the most severe chronic pain case that we've seen' because ibuprofen, not narcotic pain medication, was used."). Because the ALJ did not adequately analyze conflicting evidence regarding Mr. Zavala's purported drug-seeking behavior, this does not constitute a clear and convincing reason to discount his testimony. *See Potter*, 2015 WL 1966715, at *22.

Second, the ALJ explained that Mr. Zavala's reported travel and work performed after the alleged onset date undermined his claimed disability.[276] One the one hand, with respect to Mr. Zavala's travel, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent" with eligibility for disability benefits. *Garrison*, 759 F.3d at 1017. In *Garrison*, the Ninth Circuit recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," and found that "only if her level of activity were inconsistent with a claimant's claimed limitations would these

---

[271] AR 37–38.

[272] AR 720.

[273] AR 546.

[274] AR 730.

[275] AR 642, 651, 654, 657–58, 663, 666, 675, 678, 681, 714.

[276] AR 37–38.

activities have any bearing on her credibility." *Id.* at 1016 (quotations and citations omitted); *see also Smolen*, 80 F.3d at 1287 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."). Mr. Zavala's reported travel thus does not constitute a sufficient reason for discounting his testimony.

On the other hand, if Mr. Zavala engaged in work after the alleged onset date, then his "misleading testimony to the contrary would easily qualify as a 'clear and convincing' reason justifying the ALJ's adverse credibility determination." *Slotnick v. Colvin*, No. C 13-02283 RS, 2015 WL 2251266, at *5 (N.D. Cal. May 13, 2015). But it is not clear from the record whether Mr. Zavala in fact worked full- or part-time as a carpenter (or in any other capacity) after the alleged onset date.[277] Because the record is ambiguous regarding Mr. Zavala's work history from November 2012 through July 2015, this case will be remanded for further proceedings. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) ("Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."). On remand, the ALJ should consider any additional evidence submitted by the parties (including, if Mr. Zavala so elects, further testimony) relevant to Mr. Zavala's history of paid employment from November 2012 through the date of the July 15 hearing. *See Slotnick*, 2015 WL 2251266, at *5. Based on that evidence, the ALJ should reconsider the accuracy (or lack thereof) of Mr. Zavala's hearing testimony and reassess his credibility accordingly. *See id.* If the ALJ again finds that Mr. Zavala misstated his work history, depending on the exact content of the additional evidence to that effect, Mr. Zavala's description of the intensity, persistence, and limiting effects of his symptoms may permissibly be discredited. *See id.* If, in contrast, the evidence demonstrates that Mr. Zavala's testimony was not inaccurate, the ALJ will lack any clear and convincing reason to make an adverse credibility determination and must give appropriate weight to Mr. Zavala's description of the intensity, persistence, and limiting effects of his impairments. *See id.*

---

[277] AR 666 (Dr. Chow noted that Mr. Zavala worked as a carpenter); AR 687 (same).

Moreover, because the ALJ's discrediting of Mr. Zavala's testimony was based in part on his assessment of the medical evidence, including Dr. Chow's and Dr. Francis's evaluations, the court remands on this ground, too. The ALJ can reassess Mr. Zavala's credibility on remand in context of the entire record.

## CONCLUSION

The court grants Mr. Zavala's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: December 27, 2018

_____
LAUREL BEELER
United States Magistrate Judge